IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DR. KEITH SCHWARTZ, D.M.D., P.A., individually and on behalf of all those similarly situated, | § § § § | Civil Action No. |
| Plaintiff, | § § | |
| v. | § § | CLASS ACTION COMPLAINT |
| BENCO DENTAL SUPPLY CO., HENRY SCHEIN, INC., and PATTERSON COMPANIES, INC., | § § § § | |
| Defendants. | § § | **JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE.............................................................................3

III.    PARTIES................................................................................................................4

IV.     CLASS ALLEGATIONS .......................................................................................5

V.      FACTUAL ALLEGATIONS .................................................................................8

    A.     Dental Supply Market and Industry Dynamics ............................................8

    B.     Defendants Wield Market Power .................................................................10

    C.     Defendants' Anticompetitive Conduct........................................................12

        1.     Defendants Agreed to Pressure Manufacturers to Refrain From
             Business With Competitors ...............................................................13

        2.     Defendants Agreed to Pressure State Dental Associations to Refrain From
             Doing Business With Competitors, and to Boycott State Dental Associations
             That Endorsed, or Partnered With, Competitors ..............................14

    D.     Defendants' Have an Ongoing Pattern and Practice of Engaging in Anticompetitive
        Conduct........................................................................................................15

    E.     The Market for Distribution of Dental Supplies in the United States Is Highly Highly
        Susceptible to Anticompetitive Conspiracy ................................................16

        1.     The Dental Supplies Market Is Highly Concentrated.......................16

        2.     The Market Has High Barriers to Entry ...........................................16

        3.     Aggregate Demand is Relatively Constant .......................................17

    F.     Investigations of and Actions Against Defendants .....................................19

    G.     Harm to Competition Resulting from Defendants' Conspiracy....................20

    H.     Antitrust Injuries Suffered By Plaintiff and Other Class Members .............21

VI.     CLAIMS FOR RELIEF........................................................................................23

    COUNT ONE: VIOLATION OF SECTION 1 OF THE SHERMAN ACT .......23

VII.    PRAYER FOR RELIEF.......................................................................................23

VIII.   JURY DEMAND..................................................................................................24

Plaintiff, Dr. Keith Schwartz, D.M.D., P.A., ("Plaintiff"), files this civil antitrust action under Section 2 of the Sherman Act, Section 4 and 16 of the Clayton Act, and Rule 23 of the Federal Rules of Civil Procedure, for treble damages, costs of suit, and other relief as may be just and proper, on behalf of himself and those similarly situated against Defendants BENCO DENTAL SUPPLY CO. ("Benco"), HENRY SCHEIN, INC. ("Henry Schein") and PATTERSON COMPANIES, INC. ("Patterson") (collectively, "Defendants") for Defendants' unlawful conspiracy to monopolize the Dental Supplies market in the United States through group boycotting in violation of Section 1 of the Sherman Act. Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges:

## I.  INTRODUCTION

1.  Defendants are the three principal providers of Dental Supplies in the United States. Products in the Dental Supplies market include, but are not limited to: acrylics, adhesive agents, alloys, anesthetics, articulating products, burs, cements and liners, crown and bridge products, endodontics, implants, impression materials, instruments, pins and posts, retraction materials, rubber dam materials, and waxes as well as infection control products, x-ray accessories, imagining devices, dental chairs, dental CAD/CAM systems, and other dental office equipment. Together Defendants dominate the Dental Supplies market and wield market power. During the Class Period (defined below) Defendants' collective market share was and continues to be over 80% of all Dental Supplies sales.

2.  Since at least as early as January 2012, Defendants have conspired to monopolize the Dental Supplies market by, among other anticompetitive actions, engaging in and/or threatening group boycotts in order to block or otherwise substantially impair the ability of rivals to compete in the Dental Supplies market. As a result of the conduct alleged herein and notwithstanding periods of decreasing demand over the Class Period, Defendants were able to not only maintain but consistently

increase prices of Dental Supplies, and thereby extract monopolistic overcharges from Plaintiff and other Class Members.

3.      In April 2015, the Texas Attorney General filed a petition against Defendant Benco, in which the Attorney General alleged that in response to the Texas Dental Association's ("TDA") October 2013 launch of Perks Supplies ("Perks"), an online sales joint venture with SourceOne Dental, Inc. ("SourceOne"), Defendant Benco agreed, as is alleged here, to (i) boycott the 2014 TDA annual meeting, and (ii) threatened boycotts of various Dental Supply manufacturers who supported and/or supplied Perks. Defendant Benco consented to a judgment and stipulated injunction the same day the Texas AG filed the petition. Though Benco denied the allegations, it nevertheless paid $300,000 in legal costs and fees, and agreed to substantial relief, including (i) refraining from a broad manner of unlawful conduct consistent with the anticompetitive boycotting allegations, and (ii) complete cooperation with and ongoing monitoring by the Texas AG's office. Such cooperation includes the bi-yearly provision for three years of "log of all oral and written communications, relating in whole or in part to the distribution or sale of Dental Supplies in the United States" as between Benco's agents and the agents of each of the other Defendants.[1]

4.      The Texas' AG's allegations were consistent with those previously asserted by Defendants' competitor, Archer and White Sales, Inc. ("Archer") in a complaint filed in the Eastern District of Texas in August 2012.[2] In that complaint, Archer alleged that Defendant Henry Schein agreed, as alleged here, to pressure (i) the American Dental Cooperative, Inc. to revoke the membership of Archer's sales agent; and (ii) Dental Supplies manufacturers to stop supporting and/or

---

[1] *See Texas v. Benco Dental Supply Co.*, D-1-GN-15-001386 (Dist. Ct. Travis Cty. Petition and Agreed Final Judgment and Stipulated Inj. filedFiled Apr. 9, 2015). Months later, SourceOne filed its own suit against Defendants concerning the same conduct at issue in the Texas AG's petition. *See SourceOne Dental, Inc. v. Patterson Companies, Inc.*, 2:15-cv-05440-JMA-GRB (E.D.N.Y. Compl. filed Sept. 21, 2015).

[2] *See Archer and White Sales, Inc. v. Henry Schein, Inc.*, 2:12-cv-00572-JRG-RSP (E.D. Tex. Compl. filed Aug. 31, 2012).

supplying Archer. As a result of that pressure, membership was revoked and manufacturers stopped supplying Archer. Archer further alleged that Defendant Henry Schein offered to stop the boycott as long as Archer agreed to fix Dental Supply prices.

5.      Defendant's unlawful boycotting conduct is now also being investigated by the Attorney General of the State of Arizona as well as the Federal Trade Commission ("FTC"). Notwithstanding the above suits, judgments, and investigations, Defendants' unlawful conduct and its injurious effects have continued unabated.

6.      Plaintiff, on behalf of himself and other Class Members, seeks redress for the overcharge injuries both he and the other Class Members have sustained as a result of Defendants' unlawful group boycotting and other anticompetitive conduct in violation of Section 1 of the Sherman Act.

## II.      JURISDICTION AND VENUE

7.      This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover threefold damages, interest, costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiff and Direct Purchaser Class Members (defined below) resulting from Defendants' unlawful anticompetitive foreclosure of the Dental Supplies market in the United States (defined below). The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 15.

8.      Venue is proper in this district pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period (defined below), each Defendant resided, transacted business, was found, or had agents in this district, and a substantial portion of the alleged activity affected interstate trade and commerce discussed below has been carried out in this district.

9.      Defendants' conduct, as described in this complaint, was within the flow of, was intended to have a substantial effect on, and did have a substantial effect on, the interstate commerce of the United States, including in this district.

10.     During the Class Period, Defendants sold and shipped Dental Supplies in a continuous and uninterrupted flow of interstate commerce, which included sales of Dental Supplies in this district, advertisement of Dental Supplies in media in this district, monitoring purchase of Dental Supplies by dental practitioners within this district, and the employment of sales representatives serving this district. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this district.

11.     This Court has personal jurisdiction over each Defendant. Each Defendant throughout the United States and including in this district has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme. The scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

## III.    PARTIES

12.     Plaintiff Keith Schwartz, D.M.D., P.A. ("Plaintiff"), a domiciliary of the State of Florida, is a dentist who, during the Class Period, practiced dentistry in Florida. During the Class Period, Dr. Schwartz purchased Dental Supplies directly from Defendants, including, most notably, Defendant Henry Schein.

13.     Defendant Benco Dental Supply Co. ("Benco") is a Delaware corporation with its principle place of business in Pittston, PA. Benco sells Dental Supplies to dental practitioners throughout the United States, including to dental practitioners located in this district.

4

14.     Defendant Henry Schein, Inc. ("Henry Schein") is a Delaware corporation with its principle place of business in Melville, New York. Henry Schein sells Dental Supplies to dental practitioners throughout the United States, including to dental practitioners located in this district.

15.     Defendant Patterson Companies, Inc. ("Patterson") is a Minnesota corporation with its principle place of business in St. Paul, Minnesota. Patterson sells Dental Supplies to dental practitioners throughout the United States, including to dental practitioners located in this district.

16.     All of the actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of its predecessors-in-interest) within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## IV.   CLASS ALLEGATIONS

17.     Plaintiff, on behalf of himself and all other similarly situated direct purchaser plaintiffs, seeks damages, measured as overcharges, trebled, against Defendants based on allegations of anticompetitive conduct in the market for Dental Supplies. Products in the Dental Supplies market include, but are not limited to: acrylics, adhesive agents, alloys, anesthetics, articulating products, burs, cements and liners, crown and bridge products, endodontics, implants, impression materials, instruments, pins and posts, retraction materials, rubber dam materials, and waxes as well as infection control products, x-ray accessories, imagining devices, dental chairs, dental CAD/CAM systems, and other dental office equipment.

18.     Plaintiff brings this action on behalf of himself and, under Fed. R. Civ. P. 23(a) and (b)(3), as a representative of a class of direct purchasers (the "Class" or "Direct Purchaser Class") defined as follows:

**All persons who or entities which purchased Dental Supplies (including, but are not limited to: acrylics, adhesive agents, alloys, anesthetics, articulating**

**products, burs, cements and liners, crown and bridge products, endodontics, implants, impression materials, instruments, pins and posts, retraction materials, rubber dam materials, and waxes as well as infection control products, x-ray accessories, imagining devices, dental chairs, dental CAD/CAM systems, and other dental office equipment) directly from either Benco, Henry Schein, or Patterson in the United States and its territories and possessions at any time during the period January 20, 2012 through and until the anticompetitive effects of Defendants' conduct cease (the "Class Period").**

**Excluded from the Direct Purchaser Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.**

19.     Members of the Direct Purchaser Class are so numerous that joinder is impracticable. Plaintiff believes that the Class is composed of thousands of dentists and other dental practitioners. Further, the Direct Purchaser Class is readily identifiable from information and records in Defendants' possession.

20.     Plaintiff's claims are typical of the Direct Purchaser Class claims. Plaintiff and all Class Members were damaged by the same wrongful conduct of the Defendants, *i.e.*, they paid artificially inflated prices for Dental Supplies as a result of the Defendants' wrongful conduct.

21.     Plaintiff will fairly and adequately protect and represent the interests of the Direct Purchaser Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Direct Purchaser Class.

22.     Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with particular experience with class action antitrust litigation involving pharmaceutical and medical industry products.

23.     Questions of law and fact common to the members of the Direct Purchaser Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Direct Purchaser Class thereby making overcharge damages with respect to the Direct Purchaser Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

24.     Questions of law and fact common to the Direct Purchaser Class include:

a.   whether and to what extend Defendants collectively possess market power in the Dental Supplies market;

b.   whether and to what extent Defendants conspired to exclude and otherwise impair rivals in the Dental Supplies market;

c.   whether and to what extent Defendants agreed to illegally boycott or threaten to illegally boycott rivals and other market participants in order to maintain market dominance and higher prices;

d.   whether and to what extent Defendants in fact illegally boycotted and/or threatened to illegally boycott rivals and other market participants;

e.   whether and to what extent Defendants entered into exclusionary agreements which substantially foreclosed rivals from competing in the Dental Supplies market;

f.   whether, and if so to what extent, Defendants' conduct caused antitrust injury (*i.e.*, overcharges) to Plaintiff and Class Members; and

g.   the quantum of aggregate overcharge damages to the Class.

25.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

26.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.      FACTUAL ALLEGATIONS

### A.      Dental Supply Market and Industry Dynamics

27.      Dental practitioners across the United States routinely purchase and consume a wide variety of Dental Supplies in their daily operations. Such purchases may amount to as much as 6-10% of a dental practitioner's annual income.

28.      Most Dental Supplies are sold by manufacturers to intermediate distributors such as Defendants, who, in turn, resell those products to dental practitioners. Because dental practitioners require many different supplies from many different manufacturers, they generally purchase Dental Supplies from distributors offering a wide range of products from many different manufacturers, rather than placing individual orders with dozens of different manufacturers. Dental Supplies distributors, such as Defendants, carry the full range of Dental Supplies from all or nearly all Dental Supplies manufacturers, giving dental practitioner's the ability to one-stop shop, a convenience for which Defendants have traditionally charged a premium.

29.      The higher price Defendants have traditionally charged for the one-stop shopping service has left economic space for additional distributors to enter the market by being more efficient, earning lower margins, or both. Such new distributors can pay manufacturers more than Defendants are paying while also charging Plaintiff and other Class Members less and still earn a profit. New entrants have the opportunity to become lower-cost distributors for manufacturers and lower-cost suppliers for dental practitioners.

30.      However, because of Defendants' anticompetitive conduct as described herein, the Dental Supplies market remains highly concentrated, with significant barriers to entry caused by Defendants' anticompetitive conduct. Together, Defendants make up over 80 percent of all sales in the Dental Supplies market in the United States.

31.     In order for an entity to enter the distributor market and successfully sell Dental Supplies to dental practitioners in the United States, several key elements are required. The distributor must be able to offer dental practitioners a similarly wide range of Dental Supplies from the over 300 Dental Supplies manufacturers. The distributor must be able to purchase Dental Supplies in large enough volumes and at low enough prices to compete with Defendants. Finally, the entity must be able to market itself and offer Dental Supplies to large numbers of dental practitioners. To achieve success, and be able to buy and stock the large quantity of supplies necessary to achieve economies of scale that allow for lower prices, new distributors must be able to efficiently reach large numbers of dental practices, laboratories, and Dental Supplies manufacturers.

32.     State dental associations—voluntary associations of dentists—possess an important ability to connect a new distributor with dental practitioners statewide by endorsing and/or partnering with the distributor. State dental associations are not in the business of purchasing and selling Dental Supplies, but they can help to facilitate the entry of new distributors by partnering with new distributors and endorsing the distribution platform for their members. In this way, state dental associations serve an important gatekeeper function in validating new entrants. However, state dental associations are also a convenient "choke point" that Defendants can and have pressured through group boycotts to block the entry of less expensive new distributors.

33.     Lower-cost distributers have for years attempted to enter the market, and many state dental associations have been actively interested in sponsoring, and partnering with, new distribution platforms as a benefit to their members. However, new distributors have largely been unsuccessful in partnering with or securing the endorsement of state dental associations because of Defendants' unlawful coordinated boycotts alleged herein. Defendants have refused to do business with any new competitor in the Dental Supplies market, and have frustrated other entities' attempts to do business with actual and potential rival distributors. Any successful entry of a new competitor into the Dental

Supplies distribution market, and the resulting price discounts that would result from increased competition, would substantially threaten Defendants' collective market share, revenues, and profits. As further detailed below, Defendants responded to the threat of new competitors by conspiring to boycott and threaten entities in order to prevent the successful entry of new competitors into the Dental Supplies distribution market.

34.     Defendants' dominant collective market power has allowed them to substantially foreclose the market to rival competition, thereby impairing competition, maintaining and enhancing market power, and enabling Defendants to charge Plaintiff and other Class Members inflated prices above competitive levels for Dental Supplies.

**B.     Defendants Wield Market Power**

35.     Defendants' anticompetitive conduct and agreements constitute a horizontal group boycott that is a *per se* violation of Section 1 of the Sherman Act. Thus, a relevant market need not be defined.

36.     Alternatively, if the Court determines that Plaintiff' Sherman Act claim cannot proceed under a *per se* theory, Defendants' anticompetitive conduct and agreements constitute a violation of the Sherman Act under the "rule of reason."  In this case, the relevant market, limited geographically to the United States, is the market for distributing and selling a wide range of Dental Supplies, including offering direct purchasers the convenience of one-stop shopping.

37.     As detailed below, many hundreds of manufacturers make Dental Supplies, but most of the over 135,000 dental practices are small companies that lack the ability to efficiently fulfill their Dental Supplies needs by separately purchasing through hundreds of different vendors. Instead, direct purchasers of Dental Supplies rely on aggregating vendors, like Defendants, to fulfill most or all of their needs for Dental Supplies with one-stop shopping convenience.

38.     For direct purchasers, there are no reasonably available substitutes for distributors of a wide range of Dental Supplies. Even if individual manufactures sell supplies directly, they do not carry a wide range of supplies and it is not economically efficient for dental practitioners to maintain relationships with hundreds of different vendors.

39.     At all relevant times Defendants possessed market power—the ability to profitably raise prices significantly above competitive levels while not losing sales—as evidenced by Defendants' abnormally high profit margins in what should, if it were competitive, be a tight, low profit margin, distribution market.

40.     A small but significant non-transitory increase in price by Defendants would not have caused them to lose a significant amount of sales.

41.     Suppliers of one or a limited range of Dental Supplies do not meaningfully discipline Defendants' pricing power, and products sold by limited suppliers do not exhibit significant positive cross-price elasticity of demand with respect to products sold by Defendants.

42.     Defendants sell Dental Supplies at prices well in excess of marginal costs and the competitive price and therefore have enjoyed artificially high profit margins, especially when compared with distributors of other types of medical products, like prescription pharmaceuticals.

43.     An alternative relevant market, limited geographically to the United States, is the market for the distribution and sale of Dental Supplies.

44.     Defendants collectively have substantial market power in all relevant markets.

45.     Defendants abused their dominant collective market power by privately communicating and reaching an agreement to engage in an anticompetitive scheme to foreclose and impair competition, maintain and enhance market power, and artificially inflate prices of Dental Supplies above competitive levels.

C.       **Defendants' Anticompetitive Conduct**

46.      In 2013, a new distributor—SourceOne—created a Dental Supplies distribution platform in partnership with the Texas Dental Association ("TDA"), planning to offer many of the same products offered by Defendants, at lower prices. The resultant "TDA Perks Supplies" online sales platform allowed TDA members to purchase Dental Supplies from many different manufacturers.

47.      SourceOne reached an agreement with several manufacturers to offer Dental Supplies to TDA members at prices that were substantially less than Defendants' prices for similar products. The endorsement of the TDA allowed the new distributor to secure contracts with a significant number of Dental Supplies manufacturers, which in turn enabled it to offer dental practices the one-stop shopping convenience that was previously only offered by distributors such as Defendants.

48.      Encouraged by the initial success of the TDA website, SourceOne and other competitors planned to partner with other state dental associations and national organizations to develop similar distribution platforms. The nationwide expansion of online distribution platforms would have significantly increased competition in the distribution market, resulting in lower Dental Supplies prices for all direct purchasers such as Plaintiff and other Class Members.

49.      Even though they were direct competitors, Defendants nonetheless engaged in regular communications with each other as a means to reach an agreement on a collective response to the threat posed by SourceOne and other new competitors. For instance, Defendants frequently communicated with each other using difficult-to-track-and-trace in-person, electronic and telephonic methods to exchange competitively sensitive information, discuss boycotting strategies, and reach other anticompetitive agreements.  Many of Defendants' employees previously worked at another Defendant company. These overlapping business and personal relationships facilitated the sharing of sensitive competitive information and furthered Defendants' unlawful collusion.

50.     In response to the threat of new competitors entering the market, Defendants reached an agreement with one another to thwart the success of new competitors through unlawful threats and boycotts of competitors, such as SourceOne, and entities that dealt with competitors. Defendants' conspiracy included the following elements, among others:

1.      **Defendants Agreed to Pressure Manufacturers to Refrain From Doing Business With Competitors**

51.     Many Dental Supplies manufacturers make substantial portions of their total sales through Defendants. These manufacturers substantially rely on Defendants to market and re-sell their products to dental practitioners. If Defendants were to stop selling products from one of these manufacturers, or if Defendants were to reduce their efforts to sell a manufacturer's products, that manufacturer would suffer significant financial losses.

52.     Defendants conspired to collectively pressure and threaten manufacturers and other distributors to discontinue and refrain from supplying new lower-priced distributors with Dental Supplies. In furtherance of this conspiracy, Defendants threatened that if a manufacturer did business with new lower-priced distributor, Defendants would not sell or would not actively promote that manufacturer's products.

53.     Because Defendants collectively hold a dominant share of the Dental Supplies market, and because many manufacturers are beholden to Defendants, these threats were successful in coercing manufacturers to cease doing business with other distributors, such as SourceOne.

54.     Notably, the relatively few manufacturers who did not rely on Defendants for a substantial portion of their revenues generally did not cease to do business with Defendants' competitors, such as SourceOne. These manufacturers were not as impacted by Defendants' boycotts and threats because their profitability was not dependent on sales to Defendants.

55.     In a competitive market, a single distributor's boycott of a Dental Supplies manufacturer would contravene that distributor's unilateral self-interest. A customer wishing to

13

purchase products from the boycotted manufacturer would simply purchase the products through a competing distributor. That competing distributor would, in turn, gain market share and profits at the expense of the distributor unilaterally conducting the manufacturer boycott. Accordingly, a manufacturer boycott of the type alleged here would only occur, and only makes economic sense, if those entities engaging in the manufacturer boycott were doing so collectively, and by agreement. Had Defendants not been acting as a part of a conspiracy, it would have made no economic sense for any one individual Defendant to boycott Dental Supplies manufacturers.

2.  **Defendants Agreed to Pressure State Dental Associations to Refrain From Doing Business With Competitors, and to Boycott State Dental Associations That Endorsed, or Partnered With, Competitors**

56.     Distributors of Dental Supplies, including Defendants, regularly send sales representatives to attend and participate in state dental association annual meetings and trade shows. State dental associations depend on the attendance of Dental Supplies distributors at their annual expos—especially major distributors like Defendants—because revenues from these shows account for a substantial portion of the dental associations' annual incomes.

57.     Defendants conspired to boycott the annual trade shows and meetings of state dental associations which did or were considering whether to do business with Defendants' competitors, such as SourceOne. As part of the conspiracy alleged herein, Defendants also pressured Dental Supplies manufacturers and other distributors to join these boycotts.

58.     In furtherance of this conspiracy, Defendants threatened to boycott the annual meetings and trade shows of the TDA, the Arizona Dental Association ("AZDA"); and the Louisiana Dental Association ("LDA"). Defendants not only threatened, but actually did boycott the annual meetings and trade shows of the TDA and the AZDA. The LDA had previously planned to endorse SourceOne's online platform, but in the face of Defendants' threatened boycotts, the LDA reversed itself, and abandoned those plans.

14

59.     With knowledge of the examples of Defendants' successful boycotts of the TDA and AZDA, other state dental associations were deterred from partnering with new distributors.

60.     Defendants' boycotts of state dental associations that did business with new, disruptive distributors were highly effective. State dental associations, including the LDA, abandoned plans to endorse or partner with competitors and were deterred from doing business with those new competitors.

61.     In a competitive market, a single distributor's unilateral boycott of a state dental association annual meeting or trade show would contravene that distributor's self-interest. Sending sales representatives to trade shows allows a distributor to promote its brand and market its services to thousands of state dental association members. In many cases, distributors that withdrew from trade shows to boycott a dental association lost significant security deposits. Thus, had Defendants not been acting as a part of a conspiracy, it would have made no economic sense for any individual Defendant to have unilaterally boycotted state dental association trade shows.

**D.    Defendants' Have an Ongoing Pattern and Practice of Engaging in Anticompetitive Conduct**

62.     Defendants have engaged in other collective anticompetitive conduct against distributors of Dental Supplies for many years.

63.     For example, in 2012, Archer and White Sales, Inc., ("Archer"), a lower-priced distributor of Dental Supplies, filed an antitrust case claiming that certain Defendants engaged in anticompetitive conduct including: (i) conspiring to thwart Archer's growth in certain parts of the country; (ii) engaging in a price-fixing conspiracy by agreeing not to competitively bid against horizontal competitors; (iii) obstructing Archer's membership in the American Dental Cooperative, an organization created to help smaller companies compete against large national Dental Supplies distributors; and (iv) coordinating boycotts against Archer by threatening to stop buying equipment from certain suppliers and to stop selling equipment from certain manufacturers.

E. **The Market for Distribution of Dental Supplies in the United States Is Highly Highly Susceptible to Anticompetitive Conspiracy**

64.     The market for the distribution of Dental Supplies exhibits a number of characteristics that increase its susceptibility to anticompetitive conspiracy among Dental Supplies distributors. These factors—including high concentration among firms in the market, barriers to entry caused by Defendants' anticompetitive conduct, stable or constant demand, and a record of antitrust inquiry—indicate the potential for successful collusion among Dental Supplies distributors.

1.     **The Dental Supplies Market Is Highly Concentrated**

65.     Defendants' combined market share has steadily increased over the past five years. Together, Defendants comprise well over 80 percent of the Dental Supplies market.

66.     While Defendants sell Dental Supplies nationwide, most other distributors are much smaller, regional, and local companies serving specific areas. Due to the conduct alleged herein, competitors have been unable to establish a solid nationwide presence that could put pressure on Defendants to reduce prices.

67.     The Herfindahl-Hirschman Index ("HHI") is a measure of industry concentration that economists often use to quantify the degree of market concentration. The U.S. Department of Justice considers an HHI value higher than 2,500 to be a "highly concentrated" industry. In the market for Dental Supplies, the HHI is above 3,000.

68.     A concentrated market makes it easier for distributors to coordinate behavior and makes it more difficult for direct purchasers to avoid the adverse effects of collusive behavior.

2.     **The Market Has High Barriers to Entry**

69.     High barriers to entry caused by Defendants' anticompetitive conduct increase the likelihood that distributors can successfully conspire to further increase barriers to entry, thereby restricting the ability of new low-cost Dental Supplies providers to enter the market.

70.     The market has certain chokepoints, such as prominence and importance of state dental associations to the success of new distributors, and the market power of the Defendants over the manufacturers that make manufacturers particularly reliant upon the Defendants, collectively, that make it susceptible to a Defendant-driven group boycott.

71.     These barriers to entry increase the market's susceptibility to a coordinated effort among the largest suppliers in the industry to maintain supracompetitive prices.

### 3.     Aggregate Demand is Relatively Constant

72.     In a competitive market, firms faced with static or declining demand conditions will attempt to increase sales by decreasing prices to take market share from competitors. For this reason, firms faced with static or declining demand have a greater incentive to collude to avoid price competition. Rising or stagnant prices and high profit margins with constant or declining demand are inconsistent with a competitive market.

73.     While aggregate demand among purchasers of Dental Supplies has been relatively constant over the past eight years, Defendants have consistently increased their prices during that time.

74.     An estimated 75 percent of all sales are made through Dental Supplies distributors, and single-dentist dental practices account for the bulk of purchases. Because most dental practitioners cannot expend the resources necessary to coordinate the purchasing of all of their required Dental Supplies directly from hundreds of different manufacturers, distributors like Defendants can resell products and equipment at significant profit margins.

75.     Because demand for Dental Supplies is a function of the demand for dental services, and many privately insured adults and children receive routine dental care coverage, demand for Dental Supplies among dental practices is especially consistent.

76.     As shown in the chart below, Defendants Henry Schein and Patterson have increased list prices for Dental Supplies every year since 2005, even in the face of the 2009 economic recession that caused demand for Dental Supplies to fall by over 2 percent.

**Changes in Dental Supplies Demand versus Distributor List Prices**



77.     Defendants are highly profitable.   Defendant Patterson, for example, had profit margins around 11% in 2010 and 2011. Profit margins among distributors in related health care product markets are significantly lower. For example, profit margins for the "big three" distributors of pharmaceuticals in the United States (McKesson, Cardinal Health, and AmerisourceBergen) typically hover between 0.2 and 1.5 percent. The most recent public data for the "big three" shows quarterly profit margins between 1.03 and 1.37 percent.

78.     Rising prices in the face of declining demand is consistent with an industry in which sellers are conspiring to exert market power. The Dental Supplies distribution industry has experienced consistently increasing list prices while demand has either declined or stagnated.

**F.      Investigations of and Actions Against Defendants**

79.     In 2014, the Texas AG initiated an investigation of Defendants for anticompetitive conduct in violation of Texas antitrust statutes. On April 9. 2015, the Texas Attorney General filed a petition against Defendant Benco, alleging that Benco conspired with other distributors to boycott the 2014 TDA annual meeting because the TDA had partnered with SourceOne, and that Benco and other distributors pressured distributors and manufacturers to discontinue doing business with SourceOne. The allegations in the Texas AG action constitute part of the unlawful conspiracy at issue here.  Those allegations include:

- "Benco and its competitor distributors engaged in ongoing communications over several months about [a new low-cost distributor]. They shared information about market players' reactions to the new firm's entry, they collectively developed a response, and they provided reassurances to market participants about the collective response."

- "Benco and its competitor distributors (1) agreed to break with their traditional pattern and boycott the annual TDA meeting held in May 2014 because they perceived that [a new low-cost distributor] had positioned itself as a competitor to the traditional distributors, and (2) agreed to pressure other distributors and manufacturers to discontinue supplying [the new low-cost distributor] and/or end any relationships with manufacturers or distributors that ultimately supplied [the new lowcost distributor] in order to stifle the competition provided by the new TDA offering."

- "Benco and its competitor distributors did not attend the annual TDA meeting, despite the economic gains Benco and other distributors historically derived from the event."

- "Benco and its competitor distributors contacted other distributors and manufacturers to pressure those entities to discontinue any relationships that ultimately supplied [the new low-cost distributor]. As a result of this pressure, other distributors and manufacturers discontinued such relationships, causing [the new low-cost distributor] to lose access to products."

80.     Simultaneous with the Texas AG's filing of the petition, the parties also filed a consent judgment, which required Defendant Benco to (i) pay $300,000 in litigation costs, and (ii) cooperate

in the Texas Attorney General's ongoing investigation of other distributors, and (iii) agree to continuing oversight by the Texas AG's office for a three-year period.

81.     In 2014, the Arizona Attorney General initiated an investigation of Benco and other yet-unknown Dental Supplies distributors for anticompetitive conduct in violation of Arizona law. In October 2014, the Arizona Attorney General issued Civil Investigative Demands ("CIDs") requiring Benco to produce documents and electronic materials relating to the investigation, and Benco produced documents in response to the CIDs. That investigation is ongoing.

82.     After the Texas and Arizona Attorneys General launched investigations, the FTC opened an investigation of Benco and other unnamed Dental Supplies distributors. That investigation is ongoing.

83.     A private antitrust action by Archer against certain Defendants was filed in the U.S. District Court for the Eastern District of Texas in August of 2012. That case is proceeding in arbitration.

84.     A separate private antitrust action by SourceOne against Defendants is pending in the Eastern District of New York.

85.     Notwithstanding these government investigations and private enforcement actions, Defendants's anticompetitive conduct and its consequences remain unabated.

**G.     Harm to Competition Resulting from Defendants' Conspiracy**

86.      The anticompetitive conduct described in this Complaint maintained and increased Defendants' collective market power, enabling Defendants to maintain prices above competitive levels, to the detriment of Plaintiff and other Class Members. This harm to the Plaintiff and other Class members, in the form of paying artificially inflated prices for Dental Supplies, constitutes cognizable antitrust injury and harm to competition under the antitrust laws. To the extent relevant, the anticompetitive actions alleged in this Complaint had other competitive harms as well. As a result

of the successful boycotts of new entrants, other potential competitors were discouraged from partnering with manufacturers and/or state dental associations to compete with Defendants.

87.     Other than the artificially inflated prices charged to Plaintiff and other Class members, the anticompetitive effects of the conspiracy alleged herein include, inter alia: reduced competition in the Dental Supplies distribution market, reduced consumer choice, and harm to consumer welfare generally.

88.     There are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint, or for any aspect of Defendants' conspiracy standing alone, and even if there were, there are less restrictive means of achieving those purported procompetitive effects. To the extent that Defendants' anticompetitive conduct or any aspect of their conspiracy has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

**H.     Antitrust Injuries Suffered By Plaintiff and Other Class Members**

89.     During the Class Period, Plaintiff and other Class Members purchased Dental Supplies from Defendants. As a result of Defendants' anticompetitive conduct alleged herein, members of the Class paid Defendants prices for Dental Supplies that were inflated above competitive levels during and throughout the Class Period.

90.     If new low-cost distributors had not been unlawfully prevented from partnering with state dental associations and/or Dental Supplies manufacturers, they would have emerged as significant competitors to Defendants, resulting in greater competition and substantially lower prices for Dental Supplies, and Plaintiff and the members of the Class would have paid substantially less for Dental Supplies during and throughout the Class Period.

91.     If Defendants had not unlawfully conspired to prevent new low-cost distributors from partnering with state dental associations and/or Dental Supplies manufacturers, other competitors would have partnered with state dental associations and manufacturers and emerged as viable

21

nationwide competitors to Defendants, resulting in increased competition and substantially lower prices for Dental Supplies, and Plaintiff and the members of the Class would have paid substantially less for Dental Supplies as a result during and throughout the Class Period.

92.     Because Defendants were successful in unlawfully preventing new low-cost distributors and other competitors from partnering with state dental associations and Dental Supplies manufacturers to compete with Defendants, competition in the market was substantially harmed, and Plaintiff and members of the Class have sustained, and continue to sustain, substantial losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

93.     Injury to Plaintiff and members of the Class was a direct and foreseeable result of Defendants' anticompetitive conduct. Defendants' group boycotts foreclosed new entrant competitors, thereby suppressing competition, enhancing market power, and enabling Defendants to charge artificially inflated prices for Dental Supplies to dental practitioners. Although the mechanism of antitrust injury to Plaintiff and to competitors is the same, the damages caused to Plaintiff and other Class Members in the form of artificially inflated higher prices is distinct from, and not duplicative of, the damages caused to competitors in the form of lost profits and business opportunities.

94.     Defendants' anticompetitive conduct is continuing, and so are the overcharges suffered by Plaintiff and the Class caused by Defendants' conduct.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

95.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

96.    As set forth above, in violation of § 1 of the Sherman Act, Defendants entered into agreements with one another to boycott and threaten to boycott state dental associations, Dental Supplies distributors, and Dental Supplies manufacturers that were doing business or considering doing business with new low-cost distributors and other competitors. This conspiracy was a *per se* unlawful group boycott, or in the alternative, was an unlawful restraint under the rule of reason.

97.    Each Defendant has committed at least one overt act—such as boycotting and/or threatening to boycott entities that did business with competitors—to further the conspiracy alleged herein.

98.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations. The injury to Plaintiff and the Class consists of paying prices for Dental Supplies inflated above competitive levels. Such injury, in the form of overcharges, is of the type that antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

## VII.    PRAYER FOR RELIEF

99.    WHEREFORE, Plaintiff, on behalf of himself and the Class, prays that the Court:

i    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the class, and declare Plaintiff each as a named representative of the Class;

ii    Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

    iii  Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

    iv  Award the Class damages (*i.e.*, three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

    v  Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

    vi  Award such further and additional relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court may deem just and proper under the circumstances.

## VIII.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the proposed class, demands a trial by jury on all issues so triable.

Dated: January 24, 2016

Respectfully submitted,

By:  /s/ Warren T. Burns

    Warren T. Burns
    State Bar No. 24053119
    BURNS CHAREST LLP
    500 North Akard Street, Suite 2810
    Dallas, Texas 75201
    Telephone: (469) 904-4550
    Facsimile: (469) 444-5002
    wburns@burnscharest.com

***Local Counsel to Plaintiff and the Proposed Class***

    Michael Criden
    CRIDEN & LOVE, P.A.
    7301 SW 57th Ct #515
    South Miami, FL 33143
    (305) 357-9000
    mcriden@cridenlove.com

***Counsel for Plaintiff and the Proposed Class***